May it please the Court, my name is Rosie Cho and I represent the Petitioner Hanan Saeed. This Court should grant the petition for review based on the critical errors that the I.G.A. made below. And in summary, those errors include requiring corroborating evidence when it was not required, for failing to consider all the evidence in the record, and not considering the country conditions, the voluminous country conditions that were submitted, and relying exclusively on the State Department report to find that deportations had stopped in Eritrea at that time, in Ethiopia at that time. Kennedy. Putting to one side for the moment the testimony of the expert, can you describe the reports, all the documents in the record, that support Petitioner's contention that the deportations were continuing at the time that she was in front of the end of the time this record was put together? Yes, Your Honor. In fact, to start with the expert, she's No, no. I'm putting the expert to one side for the moment.  Putting that aside for a minute. Yes, please. I'll start with the State Department country report, which the judge relied on fully. And if you actually read the State Department report, it says in there that 774 civilian ethnic Eritreans were forcibly expelled from Ethiopia at the time. And do you have a page number that you're willing to give? Yes, Your Honor. That is at 466. AR-466? Yes, that's correct, 466 of the record. Okay. I have that here in front of me. And where do I look? If you look at actually page, I believe, 13 of the report. Page 13 of this report?  Let me find that for you, Your Honor. Actually, if you look at page 4 of 32, it says ethnic clashes. I'm sorry. Say that again. What page? Actually, the record 469, Your Honor. It's page 4 of the report. 469 of the State Department report. Okay. That's correct. So where do I look? About one-third down it says ethnic clashes resulted in numerous deaths during the year. Yes. And then if you look at 471, second half of the report. Okay. So where do I look now? I'm on page 471. Second half of the report, the paragraph starting with approximately 2,000. Yes, okay. It goes on to say that 774 civilians were repatriated during the year. Okay. And that's in 2000. Okay. Yes. Okay. And then further down, actually the next paragraph down with the paragraph that starts with the government, towards the end it says the ICRC, which is the International Red Cross, also regularly visited civilian Eritrean nationals and Ethiopians of Eritrean origin detained on national security grounds. Okay. Okay. And the ---- Counsel, before you move off that point, can I also refer you back to, I believe it's the country condition report for 2002? No. It's actually your expert's report at page 216 where she testifies by declaration in paragraph 30 that the deportations of Eritrean Ethiopians may have slowed to a relative trickle compared to a few years ago. Yes, Your Honor. Certainly when the forced ---- forcible expulsion started in 1998, I believe within the first year, a quarter of a million had been forcibly expatriated. And while that may have slowed down, there was certainly error on the part of the judge to determine that the deportations had stopped completely. Okay. Now, that was paragraph 30. In the next paragraph, it says it's extremely likely that she will be arrested immediately. No reason to expect that she's going to be spared. Does that mean that I should understand the expert to say that there's a ---- what's going to happen to her with extreme likelihood is either she's going to be imprisoned under very bad conditions or she's going to be, I guess the right word is deported, Territria? That's correct, Your Honor. What else do we have in the record besides the expert's report as to the likelihood of her being imprisoned? Your Honor, there's evidence in the record. There are reports from Amnesty International, other State, country reports. And in fact, there is a report from the INS itself, former INS. And that is ---- I don't have the exact page number right now, but I can find that for you. And in that INS report, the gentleman who conducted the research actually stated that people who come to the attention of the authorities who are of ethnic Eritrean descent will either get imprisoned or expelled. And even if they are not imprisoned, there's evidence in the record that states that ethnic Eritreans must obtain incremental six-month residency permits in order to obtain any public services and that while they are able to possibly obtain exit visas, they are not able to return to the country once they leave. Now, in paragraph 33, the expert says ---- paragraph 31 says extremely likely she's going to be imprisoned. But then moving on to paragraph 33, she writes, as Hanane's family was deported, it is likely she will also be deported. I assume that both attorneys have read the decision of the panel on which Judge Palmer and I sat, the Mengstu written by Judge Nelson? Yes, Your Honor. And in that case, we remanded to the BIA for a determination as to whether or not an expulsion to Eritrea or maybe deportation, I'm not sure what the right word is, of an ethnic Eritrean from Ethiopia constituted persecution. Yes, Your Honor. Do we have any evidence? Do we know what's happened to that case? Has the BIA ruled on it? I do not know independently. I looked that up, Your Honor, and it looks like there's no decision yet. That was earlier this year, and the BIA can take a very long time. Does that mean, then, if we are to conclude that it is, in fact, likely that she's going to be sent to Eritrea if she returns to Ethiopia, that we need to remand for the BIA on the same ground that we remanded in Mengstu? Your Honor, I think that is one possible remedy. I think in this case, because she's here in the U.S., and if she is returned, she will come to the immediate attention of the authorities, given that she does not have a passport nor any other identity documents, that you could find that she has a high risk of being individually targeted. Individually targeted with what consequence? I mean, once she's targeted, what's going to happen to her? Based on the record, Your Honor, it's likely that she will be detained, and while she's detained, as the expert affidavit states, she faces horrible conditions in prison and possibly rape or other forms of sexual abuse. And I would say that that constitutes persecution. And let me make sure I follow what you're trying to say. You're saying, then, even if it's likely that she will be deported to Eritrea, it's extremely likely that before that happens, she will be imprisoned. That's correct. And you're saying that during the imprisonment, the treatment she will there receive is itself tantamount to persecution? That's correct, Your Honor. And we don't need to get to the — on that argument, we don't need to get to the makes-do question? That's correct, Your Honor. And if you were to find that that would — the record doesn't support that, then I would suggest that it be remanded so that — Well, if the record doesn't support that, hasn't there been a failure of proof on the part of the Petitioner to establish the basis for a fear of future persecution? That's what the I.J. found. Well, Your Honor, we're arguing that the record does support that fear. And in addition, alternatively, if this Court were to find that the record didn't support that, then we still have the open question of whether forcible expulsion amounts to persecution. Well, the hypothetical excludes the latter. So the question is, if the I.J. found, as a matter of fact, that there was a failure of proof to meet her burden, then why would we need to remand? We basically have to decide whether or not there is substantial evidence that supports or, I guess, a lack of evidence that supports your client's claim. Isn't that how we should review it? Well, first of all, Your Honor, the I.J. in coming to — we have to review the I.J.'s reasoning in coming to his determination that she does not have a well-founded fear. And if you look at the basis of his decision, he's — there are a number of errors that he made to come to that conclusion. And therefore, it's my contention that his finding is — cannot stand scrutiny. But if the finding — all right. Okay. I understand your argument. You've used your 10 minutes. We're not going to cut either of you off prematurely. Let's hear from the government, but we'll give you a chance to respond. Okay. Thank you. Good morning. May it please the Court. Russell, we're on behalf of Attorney General Eric Holder. With respect to corroboration, the immigration judge considered the merits of this asylum claim. I'm sorry. Could you slow down a little bit and articulate? I'm sorry, Your Honor. With respect to corroboration, the immigration judge expressed some concerns, but he did address the merits of the asylum claim. And when you look at the Board's decision, the Board went out of its way to say that we are taking all of the testimony of this witness at full weight and still finding no basis for asylum. So I think the — there's a mootness issue to be made with respect to the corroboration. Meaning we should accept what she says as true. Yes, Your Honor, because the Board absolutely did. Right. Right. And so I think — Now, whether or not there are deportations going on, I mean, that's not within our area of expertise, so that's a different question. But as to what happened to her, we just take that story as true. Absolutely. And I think she's not even 100 percent sure what happened to her parents. And she's very candid about that. At times, she's not — so we don't even know if her parents were actually deported, if this family has necessarily been in any way targeted. We know the family was most likely imprisoned for what we're not exactly sure. We do know from her testimony that she went back — went to the family house. They're not there. There's some ground where she suspects that they were deported, and she's never heard from them since. No, Your Honor. And she also checked with a refugee organization who has no record of her parents showing, but, I mean, I'll even concede that — who knows at this point. So we're not 100 percent sure. Right. Okay. I think with her own expert's testimony showing, and also that there's a trickle of deportations going on at best at this point, the main basis for asylum really no longer exists. Her own testimony is that she herself was never harassed, never harmed. Neither a family that she knows of was actually harmed or harassed in Ethiopia by the Ethiopian government on account of heritage. She does prefer to use her Muslim name, and under that name, she was able to enter the country once before. You said she prefers to use it? Or she used it. She used it. And she's still using it today. I'm not sure it prefers — I mean, she obviously took it in order to do the job in Saudi Arabia. Yeah. And she's still using it today. But she had a passport from Saudi Arabia, did she not? As far as I know, yes, Your Honor, she did. Okay. And there's no dispute that she doesn't have a passport now from anywhere because of her — No, I don't believe she does. So she will have to go in under her own name. But she was able to be in the country for 15 days, and that does undercut some well-founded fear issues. Now, why does that undercut it? I had trouble with the IJ's conclusion to that effect. And let me tell you why I had trouble with it, and then you can respond. She goes in with a Saudi passport with a Muslim name, I gather not questioned or detained at the airport, and she's there for 15 days making inquiries, and she leaves. Now, that doesn't strike me as telling us very much, if anything, as to what's going to happen if she comes back to Ethiopia without a passport and under her real name rather than her sort of assumed Muslim name. Can you help me out as to why that's irrelevant? I mean, to me, I just put that to one side, as to what's likely to happen to her if she goes back under the current circumstances. Yes, Your Honor. I mean, and I'm sure the Court is well aware of case law where we have talked about this before, when a person goes back and they're okay. And I think this is not as close to those cases where they're traveling under their own identity and that sort of thing. But I think it does show that she was able to go into the country, she was able to be in the country for 15 years, not as strong as any other case we've seen in the past at all. Fifteen days. I'm sorry, 15 days. My apologies, Your Honor. I think she did that in the record, too, at one point. That's probably why it's in my head. But I think it still shows, and she was able to go back to her neighborhood, to a home that was rented from the government by her family. I know she didn't contact the government directly, but there is some indication that she was able to be in the country. Perhaps the name and traveling under the different passport helped to a significant degree. But I still think it at least falls generally within that body of case law that says if you are permitted to get back into your country, there's some undercutting of your case, perhaps not as strong as others, Your Honor, but there is some. As I said, I think the biggest thing is that with the deportation issue going down to a trickle at this point, the basis for the asylum, which was the main fear, was deportation. And we're not even sure if deportation itself constitutes persecution, as opposed to waiting for the BIA to rule. Maybe the best thing for this case court to do, if it has to, if it comes down to whether we're sufficiently convinced she's going to be deported, and we're not sure whether deportation is persecution, then I think the best course maybe is to hold an abeyance and wait for the Board to answer that question. Hold an abeyance or remand of the Board, or just hold an abeyance for Minx, too? I mean, I think we could hold it here if we wanted to in abeyance. It's the same issue that's basically going to come up from the Board. But I think you have a one-trigger question is at this point in this case where we're down to a trickle of deportations, do we even have a sufficient enough concern that the deportation is going to occur to ask the Board? What do we do with the Board? Yes, Judge. I have a question on the use of the word trickle. Are you using that in the comparative sense that at one time there was a huge flood of deportations, and now there are relatively few? And does that make a difference in this case that maybe the pool or the reservoir is now empty because they have done all that they're going to do? Well, Your Honor, I mean, that could certainly be the case. But I think what we're talking about is the deportations that were the concern were the product of the war between these two nations. And that war has been settled. And while neither nation is very strong nor very stable, I don't think we see the wholesale issue of deportation just based purely on heritage or ethnicity. The fact that the deportations are down to a trickle is an indication that it may no longer be an overarching government policy. It may be local actors acting. Or there may be other grounds for the deportations that don't necessarily go lean towards the, I don't want to use the word, an ethnic purging of Ethiopia. Because I don't know if that's actually an accurate description of what happened during the wartime deportations. So I think the trickle is very important because it shows certainly the government policy has abated. What are we complaining about? What evidence? I'm sorry. No, go ahead. Sorry. I just was wondering, what evidence is there that there are a lot of Eritreans left in Ethiopia? I'm not sure the State Department reports give us a figure of ethnic makeup of Ethiopia right now. But I think a fair reading of them is that the government's policy that was during the wartime of mass deportations has, if not ended, come to a virtual end by just down to what they describe now as the trickle. Where did the 120,000 number come from? I thought I read reports that the estimate was there were 120,000 Eritreans still residing in Ethiopia. You know, Judge, I'm not 100% sure and I don't want to guess. It may be in the materials that were submitted to the board that didn't go to the IJ. I'm not 100% sure of that, Your Honor. There were some of that going on here. Well, I'm looking, let's see. I wouldn't even hazard a guess at this point. 484. Then that would be stuff that the IJ did look at. Yeah. 484, top of the page. Actually, it begins on 483. The government, together with the Red Cross, monitored the deportation or repatriation of 1,188 Eritrean POWs and 774 Eritrean civilians during the year. In 2001, approximately 80,000 to 100,000 Eritreans and Ethiopians of Eritrean origin resided in the country. There were no updated statistics by years in. So, yeah, I mean, a significant number of POWs returned at the end of the war or during the exchanges that were taken up during and at the end of the war. And there were definitely some deportations going on. But like I said, the number seems to have dropped significantly. What do we do with the expert statement, number one, that the rate of deportations has slowed to a relative trickle, but her statement in the same statement, later on the same page, she says, but it's likely that, in fact, because of her circumstance, she will be deported. Well, I think, you know, obviously, since that is not her testimony, it's not accepted as fact. Correct. It is expert testimony. Correct. It's up to the court to weigh expert testimony, motives of experts to testify and things like that. And I think if you compare this, her statement that she will certainly be arrested, to what the State Department says, which we don't have any indication in the State Department, 2002 or the 2003 report, although which is not really properly before because it was entered in front of the board. I don't think that if you read those reports, you get the impression that the government is throwing every person who shows up at the airport of this ethnicity into jail. And that's basically what the expert is trying to push on this Court. And I think the Court's going to have to make its own determination about that. Well, that's not quite what the expert says. The expert says, I'm just going to serve at 31 because she, that is to say Petitioner, because she has no – she no longer has her passport and other relevant documents. The authorities will stop her at the airport. That sounds pretty reasonable. When her identity and that of her family is determined, it is extremely likely she will be arrested immediately. So it's not that they're arresting – the expert's not saying that it's extremely likely that they arrest anyone who's Eritrean. They arrest anyone who's Eritrean who's traveling without a passport and then figure out that she's in this family. Now, your objections may remain. Absolutely. But the expert didn't say at the airport they arrest every Eritrean who shows up. I think that's almost – I think it's one of the ways you could read what she's saying. If you show up and you're Eritrean, I mean, I don't see what the difference is that her family – If you show up and you're Eritrean and you don't have a passport, and once her identity and that of her family is determined. Now, I can't quite judge how much more likely that is, but there are those conditions in the statement. Yes, and, Your Honor, and I think we also can say if a person were to show up in this country, even claiming to be a U.S. citizen, without travel documents and a passport, they will be detained briefly for a few moments, of course. So that – Without a passport, I think more than a few moments. In my experience, it would be far more than moments. Yes. You know, even if I showed up. So, I mean, I don't know if we can condemn the Ethiopian government for controlling its borders. That could be part of it. But the connection to the family – you know, the funny thing about the expert's testimony, the expert's statement, I should say, since it's not really testimony, is that why this family? What did this family do to deserve the ire of the government? It just says because she's a member of this family. What's missing is a causal connection between the member of this family and something that would cause the Ethiopian government to seek them out. Mm-hmm. Yeah. That's what's missing. There's that one extra thing missing in each situation in this case. Well, it's – I think it's quite clear from her testimony, taking at full value as we're doing. Absolutely. She's not saying that I had a politically active family or what is known. She's saying I had an Eritrean family. But I take the point. Yeah, sure. Yeah. So I think that's where we are. If there are no further questions, Your Honor? I do have a question as to Mengstu. Do you have any information at all as to where that case stands? No, Your Honor, I don't. I didn't check on it before we got here. I was aware of the decision, but I didn't check on where it is in the board. And it's kind of difficult, you know, other than we have pretty much the same access as to call up and say it's still in proceeding. Yeah, sure. That's where it is. And a second question. One of the responses from Ms. Cho was, well, you don't necessarily need to reach the question of deportation because if we take – and the expert's statement that it's extremely likely that she will be arrested and imprisoned, the conditions that she will be subjected to in prison are themselves a rise to persecution. Do you have a response to that? Yes, I do, Your Honor. Yeah, please. You know, prison conditions, while deplorable – you know, in my travels with the Navy, I've seen some pretty deplorable prison conditions. But – and while it's unfortunate that people have to suffer in those conditions, suffering in a prison is not persecution sufficient to grant asylum unless it is connected to a protected ground. And in this case, we would have to show the nexus that the suffering in that prison is connected to her ethnicity as opposed to just showing up without a passport and being detained until we can sort things out about her. So I'm not 100 percent sure if just the fact that she is going to be in deplorable conditions alone because she's going to be detained for reasons we're not 100 percent sure of yet, I don't think that is going to qualify as persecution under the law in this country. And what evidence do we have in the record as to conditions in Ethiopian prisons to which Eritreans might be subjected, and particularly female Eritreans without family? I mean, it gets quite specific in terms of what I think we've got here. Yeah. I mean, we're taking it down the narrow path. Yeah. But, I mean, that's the – that's the conditioner we got. Absolutely, Judge. We have to answer it. I don't – from my reading of the record, I wasn't focusing on that particular, you know, narrow question. I mean, I know there is some concern for human rights in Ethiopia, even expressed in the State Department reports. But I don't believe there's anything there that says Eritrean women are treated in such a fashion relative to the rest of the imprisoned population. I don't believe I saw anything along those lines, Your Honor. And – oh, go ahead, sorry. Mr. Verby, this may be just a crazy idea, but what authority does the Attorney General or the Secretary of Homeland Security have to grant humanitarian relief in a case like this? Well, there is humanitarian grants of asylum, Your Honor. But, I mean, how frequently is that? In my experience, Your Honor, I could – I don't have a statistic with me. And, unfortunately, the cases I see, you know, I don't see the overarching where, you know, I know – I can give you roughly, I believe, somewhere in the neighborhood of, you know, 40 or 50 percent of asylum requests are granted. I don't know how many of that. No, no, I understand that. But I understand – You've seen that footnote in our brief. I have. Yeah, we get it in the canned brief. I don't know exactly what number of those are humanitarian grants. I mean, in part, I was hoping when you took it to mediation that maybe the Attorney General or whoever it is that makes that call – Was considering it. – would consider that. Because this – I mean, we've got a stateless person here. I don't know what's going to happen to her when she goes back to Ethiopia. But – Well, with the division now, I guess, it can be granted by either the DHS, you know, because we've – with the division between moving the INS outside of the Attorney General's purview. But the way the regulation is written off the top of my head, obviously, the IJ could grant it, and that is humanitarian. And that's executive branch. That's Attorney General. Or Department of Homeland Security could grant it, and that would obviously be the DHS wing of the branch. I mean, it can be granted, but it doesn't appear likely in this case. This is not a likely case where they would do – No, Your Honor. I've seen it very, very infrequently. Yeah. Okay. And we may infer that that was on the table during the mediation. As you probably know, we don't know what happens in mediation. We don't ask what happens in mediation. It's a black box as far as we're concerned. Yeah. I was not involved in mediation. I was on extended military leave when this was in mediation. Yeah. Well, just so you know, I was in the Navy, too. Oh, okay. I was cadet shipmate. It wasn't a sin until you mentioned twice your military service. Okay. If there are no further questions, that concludes the Attorney General's presentation. Okay. Thank you. Ms. Cho. Thank you. Your Honors, it's correct that we don't know for sure what's happened to Ms. Saeed's family. However, we do have on the record that they were imprisoned on the basis of a protected ground, and that is their ethnicity. And so – and also, I just want to clarify the record. Wait a second. Do we know? I mean, I saw what the neighbor – I thought her testimony was the neighbor said that the family was – her brother and father were arrested, imprisoned, and tortured. Correct. But where do we make the link it was because they were Eritrean? Actually, that is in the record, Your Honor. I'll find that. But the neighbor did say later on – I'm sorry. Ms. Saeed did testify later that the neighbor told her it's because they are ethnic Eritreans. Oh, maybe I missed that. If you could give me the cite to that. I will give you the cite to that, Your Honor. In addition, I just want to correct the record. The passport with which Ms. Saeed entered Ethiopia for that 15-day stay was not a Saudi Arabian passport. It was an Ethiopian passport that was obtained for her. Under her Muslim name? Yes. Oh. That was obtained for her through the agency that employed her in Saudi Arabia. And also, Your Honors, the government says that at this point the deportation is down to a trickle. Well, that's not something we can determine here at this point. Well, no, it's not the government that says that. It's her expert or your expert who says – now, it doesn't say trickle. It says relative trickle. Now, that may be different from trickle, but that comes out of the expert. Okay. And also, Your Honor, I do have a motion to remand pending with this Court asking that it be – this case be remanded for a determination of pattern or practice and disfavored group, and I'm – Yeah. Now, I'll just give you my cut at that motion. What you seek to raise in that motion was never raised before. Your Honor, actually, I want to address that. I want to – I made an error in my motion to remand stating in a footnote that it had not been raised. Under more careful review of the briefing, I would argue that prior counsel did substantively raise the issue. And while he may not have used the precise legal language, he certainly, throughout his opening brief and in his reply, discussed how Ms. Saeed is part of a group that is systematically persecuted – excuse me – by the Ethiopian government and that she herself is at particular risk of being individually targeted. And I believe that, Your Honor, is a pattern of practice or disfavored group argument. Okay. Well, I guess we can look back in the record and determine that. But I have to say my initial response to that motion is that you have not exhausted anything on which you sought a remand. I can actually specifically point to where in the briefing that was discussed. It's at pages – in the opening brief, pages 10 and 19, and in the reply brief, pages 6 through 8, 9 through 10. And in the BIA brief, this was discussed in pages – in the record, pages 15 through 16 and 18 through 19. We're also seeking a motion – a remand, Your Honor, so that we – so that Ms. Saeed may seek alternative relief of adjustment of status. But you haven't exhausted that either, have you? Well, exhaustion is not required, Your Honor, where the issue that – the legal issue arises from events that occur after briefing is done to the BIA. Well, you've got to move to reopen. You can't raise this for the first time in the court of appeals. Well, you have to go back to the agency. Well, I'm arguing that the motion to reopen is not required because it's not a remedy as of right. These are events that occurred after briefing was completed. And this Court has also held that – Why isn't adjustment status a proper ground for reopening before the agency? Because these are events – new events that should be considered by the agency. And the only reason it's not being considered is because the government refuses to join in a joint motion to reopen. Ms. Saeed can file a motion to reopen with the BIA, but it would be futile because it would be denied not on the merits, but because it's untimely. And so, in effect, we're giving the government authority to – to veto a motion to reopen without ever allowing – But then you'd file a petition for review of the refusal of the board to reopen. Exactly, Your Honor. But, again, exhaustion is not required where the remedy itself is inadequate or insufficient. And I'm arguing that it is insufficient because the BIA will not address the motion to reopen on the merits. Okay. Any further questions? I've got a question for Government Counsel. On this pending motion, I'd like to know what the government's position is on that. While I'm on my way up, Your Honor, to help out counsel, it's page 407 of the record. It's where the neighbor says your parents were arrested because of their heritage. Thank you. Yes, Judge. Oh, my question is what's your response with regard to this motion about systematic persecution of a group targeted by the Ethiopian government? Well, I mean, certainly it's a new legal theory, Your Honor, that is, for the most part, as far as I've seen from the motion, based on the Seattle decision. It needs to really be aired before the board fully and argued before the board. I think a motion to reopen or a motion to reconsider, however they wanted to craft it, would have been the proper way to do it.  The motion reopened with respect, from what I understand, the mediation was mainly on, I believe, the visa petition. And in this instance, we're not going to join in that, Your Honor. Okay. At least the DHS isn't. I mean, DOJ doesn't really have a say in it. We just mediated DHS's wishes for not to join. Okay. Any further questions? No. Okay. Thank both sides for a very useful argument in this case. The case of Side v. Holder is now submitted for decision. And we are in adjournment. Thank you very much.
judges: W. Fletcher, Tallman, Dawson